J-S46029-16
J-S46030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF A.J.A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.C., FATHER | No. 309 EDA 2016 |

Appeal from the Order Entered December 15, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2015-A0078

----------------------------------------------------------------------------------

| | |
|---|---|
| IN RE: ADOPTION OF A.J.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.C., FATHER | No. 310 EDA 2016 |

Appeal from the Order Entered December 15, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2015-A0079

----------------------------------------------------------------------------------

| | |
|---|---|
| IN RE: ADOPTION OF A.J.A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.C., FATHER | No. 311 EDA 2016 |

Appeal from the Order Entered December 15, 2015

J-S46029-16
J-S46030-16

In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2015-A0080

--------------------------------------------------------------------------------

| IN RE: ADOPTION OF: A.J.A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: A.S., MOTHER | |
| | No. 302 EDA 2016 |

Appeal from the Judgment Entered December 15, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2015-A0078

--------------------------------------------------------------------------------

| IN RE: ADOPTION OF: A.J.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: A.S., MOTHER | |
| | No. 303 EDA 2016 |

Appeal from the Judgment Entered December 15, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2015-A0079

--------------------------------------------------------------------------------

| IN RE: ADOPTION OF: A.J.A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: A.S., MOTHER | |

- 2 -

J-S46029-16
J-S46030-16

|  | No. 304 EDA 2016 |

Appeal from the Judgment Entered December 15, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2015-A0080
------------------------------------------------------------------------------------

| IN RE: ADOPTION OF: K.H.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.S., MOTHER | No. 305 EDA 2016 |

Appeal from the Judgment Entered December 15, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2015-A0081

BEFORE:  BENDER, P.J.E., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED JULY 29, 2016**

In these consolidated appeals, A.M.C. (Father) and A.C. (Mother) appeal from the December 15, 2015 decrees involuntarily terminating their parental rights to their daughters, A.J.A.M.1, born in September of 2011, and A.J.M., born in December of 2010, and their son, A.J.A.M.2, born in April of 2010. In addition, Mother appeals from the December 15, 2015 decree involuntarily terminating her parental rights to her son, K.H.S., born in

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 3 -

March of 2008, who is not the natural child of Father.[1]  Upon careful review, we affirm.[2]

These appeals arise from the petitions for the involuntary termination of Mother's and Father's parental rights filed by A.F.S. (Maternal Grandmother) and A.G.S., Sr. (Maternal Grandfather) (collectively, Maternal Grandparents) on April 17, 2015, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8).  On the same date, Maternal Grandparents filed petitions for adoption of A.J.A.M.1, A.J.M., A.J.A.M.2, and K.H.S. (collectively, the Children).

We summarize the factual and procedural history as follows.  The Children have lived since birth with Maternal Grandparents.  N.T., 12/10/15, at 35-37, 45.  In December of 2010, Chester County Children and Youth Services (CCCYS) became involved with the family due to A.J.M., the third oldest child involved in this appeal, being born prematurely with illegal drugs in her system.  *Id.* at 25, 39, 42-43.  A.J.M. was discharged from the

_____

[1] On December 15, 2015, the orphans' court issued a decree granting the petition to confirm the consent of H.A.A., the putative father of K.H.S, filed by Maternal Grandparents.  He did not appeal.

[2] We note that the Guardian *ad litem* filed briefs in these appeals in support of the decrees involuntarily terminating Father's and Mother's parental rights.

hospital into Maternal Grandparents' care, and CCCYS established a safety plan that prohibited Mother from being alone with A.J.M.[3]  *Id.* at 30.

At that time, Mother and Father resided with Maternal Grandparents in Phoenixville, in Chester County.  *Id.* at 18, 26.  Maternal Grandmother implied in her testimony that, shortly after CCCYS became involved in December of 2010, Father moved out of her home.  *Id.* at 44.

Thereafter, in April of 2011, Mother left Maternal Grandparents' home with her sons, K.H.S. and A.J.A.M.2, and went to a hotel in Pottstown, in Montgomery County.  *Id.* at 35-37, 39, 41-42.  After approximately two weeks, Mother returned K.H.S. and A.J.A.M.2 to Maternal Grandparents.  *Id.* at 37, 39-40.  Mother never resided with Maternal Grandparents again.[4]  *Id.* at 41-42.

In September of 2011, A.J.A.M.1., like her sister, was born prematurely with illegal drugs in her system.  At that time, the family safety plans were transferred from CCCYS to Montgomery County Children and Youth Services (MCCYS).[5]  N.T., 12/10/15, at 42-43.  A.J.A.M.1 was

_____

[3] In June of 2011, CCCYS expanded the safety plan to include K.H.S. and A.J.A.M.2.  N.T., 12/10/15, at 41.

[4] By the time of the subject proceedings, Mother and Father resided together in a two-bedroom apartment in Pottstown.  N.T., 12/15/15, at 9.

[5] The record suggests by then Maternal Grandparents resided in Pottstown, where they continued to reside at the time of the subject proceedings.  N.T.,
*(Footnote Continued Next Page)*

- 5 -

discharged from the hospital into Maternal Grandparents' care, and MCCYS established a safety plan for that child.  *Id.* at 43-44.

On April 23, 2012, Maternal Grandmother filed an emergency complaint for custody with respect to the Children in the Montgomery County Court of Common Pleas.  By order dated May 30, 2012, the court granted Maternal Grandmother sole physical and sole legal custody of A.J.A.M.2, A.J.M., and A.J.A.M.1.  By separate order the same date, the court granted Maternal Grandmother sole physical and sole legal custody of K.H.S.

Two years later, on April 17, 2015, Maternal Grandparents filed the above-described termination petitions.  The hearing was held on December 10, 2015, during which Maternal Grandmother and Maternal Grandfather testified on their own behalf.  Mother testified on her own behalf, and she presented the testimony of N.F.-O., Father's sister, and Charlene Williams, Mother's friend.  The hearing was continued and concluded on December 15, 2015, during which Father testified on his own behalf.

At the conclusion of the testimonial evidence, the orphans' court placed its findings of fact and conclusions of law on the record in open court. *See* N.T., 12/15/15, at 109-135.  By decrees dated December 15, 2015, the

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

12/10/15, at 18.  Maternal Grandmother testified that, after Mother moved out, she and Maternal Grandfather moved with the Children to a larger home in Pottstown.  *Id.* at 19-20.

orphans' court terminated Father's and Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

On January 13, 2016, Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.[6] In addition, on January 11, 2016, Mother timely filed notices of appeal and concise statements of errors complained of on appeal, which were also consolidated.

Father presents two questions for our review:

I. Did the [orphans'] court commit an error in terminating the parental rights of Father to each of the Children, pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), where the testimony at trial demonstrated that Father had essentially been prevented from having an opportunity to provide parental duties at all relevant times?

II. Did the [orphans'] court commit an error by involuntarily terminating Father's parental rights to the Children where the facts did not establish by clear and convincing evidence that such termination was in the best interests of the Children as

---

[6] We note that the orphans' court entered separate decrees terminating Father's parental rights to A.J.A.M.1, A.J.M., and A.J.A.M.2. Father improperly filed only one notice of appeal and one concise statement of errors complained of on appeal from the decrees. **See** Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves [sic] issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). However, because Father's arguments on appeal are identical as to each child, we discern no prejudice arising from his procedural misstep. Therefore, we decline to quash Father's appeal.

contemplated by 23 Pa.C.S.A. [§] 2511(b) but, to the contrary, confirmed that a loving and positive bond exists between Father and each of the Children[?]

Father's brief at 2.

Mother presents one question for our review:

[Did] the [orphans'] court err[] when it terminated Mother's parental rights where the evidence presented was insufficient to establish by clear and convincing evidence to demonstrate that the needs and welfare of the Children would be promoted by terminating parental rights[?]

Mother's brief at 2.

We consider Father's and Mother's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

- 8 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

We conclude that the orphans' court in this case properly terminated Father's and Mother's parental rights pursuant to Section 2511(a)(1) and (b), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the

- 9 -

child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).[7]

We have explained,

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006). In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 91 (Pa. 1998).

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing

---

[7] Notably, Mother concedes in her brief that the testimonial evidence established that she failed to perform her parental duties during the six-month period prior to the filing of the termination petitions. Therefore, in this disposition, we review the decrees under Section 2511(a)(1) with respect to Father's parental rights only.

- 10 -

> parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id.* at 92 (citation omitted).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008).

> Parental duty is defined as follows:
>
> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

- 11 -

Moreover,

> It is incumbent upon a parent when separated from his child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life.

***In re G.P.−R.***, 851 A.2d 967, 976 (Pa. Super. 2004).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. ***Id***. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. ***Id***. at 63.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the orphans' court concluded that, for a period in excess of six months preceding the filing of the termination petitions, Father and Mother failed to perform their parental duties to the Children pursuant to Section 2511(a)(1). Further, the court concluded that terminating Father's and Mother's parental rights "will not sever any strong and existing bond between the [C]hildren and their biological parents. . . ." N.T., 12/15/15, at

- 12 -

134. The court concluded that terminating Father's and Mother's parental rights will serve the Children's needs and welfare pursuant to Section 2511(b).

Father argues on appeal that the court erred in terminating his parental rights pursuant to Section 2511(a)(1) because Maternal Grandparents prevented him "from having the kind of relationship he would like to have with the Children." Father's brief at 11. Specifically, Father asserts that Maternal Grandparents do not allow the Children to sleep over at his apartment, and that his "ability to visit with the Children has historically 'been up and down' and only '[w]hen the time [is] good for them.'" *Id.*

The orphans' court stated on the record in open court that it found Maternal Grandmother "to be a credible witness in virtually every regard." N.T., 12/15/15, at 127. As such, the court found no "obstacle has been put in the path of [Mother] or [Father] in terms of their children. It may not have been as convenient as they would have liked it to be, but that doesn't make it an obstacle. You had the opportunity to exercise parental duty if you had chosen to do it." *Id.* at 127-128. The testimonial evidence supports the court's findings.

Maternal Grandmother testified on direct examination as follows:

Q. Have you made any offers to [Mother] or [Father] about coming to the house and being involved with the children?

- 13 -

A. The doors are open all the time. They know they can come and go as they want. Their problem is that they always want to come and take the kids, and I don't trust them. Sometimes I let them go; sometimes I question their motives.

They have an open invitation for Sunday dinner, and every time they come to the house, I let them see the kids. And [Father] has actually taken the kids to more things than [Mother] has.

N.T., 12/10/15, at 46-47. On re-direct examination, Maternal Grandmother

testified that the Children are not a priority in Mother's and Father's lives.

*Id.* at 130. She testified:

Q. Do [Mother and Father] see the children based upon the children's schedule or what you would seem to think would be their schedule?

A. Their schedule.

*Id.*

She continued on cross-examination by the Guardian *ad litem*:

Q. [A]s far as [Father] is concerned, he seeks out contact with the children from time to time; correct?

A. Yes, he does.

Q. Approximately how frequent[ly] would you say he seeks out this contact?

A. This year probably four or five times.

Q. And is there any regularity in that contact?

A. No. I just get a text from him, or I'll get a call from [Mother] saying he wants to see the kids, or he stops by the house and asks if he can take them.

N.T., 12/10/15, at 119. Maternal Grandmother testified on direct examination that Father "comes around holidays, like Memorial Day or July 4th. He asks to take the kids to the Pottstown Parade, and I usually let them go with him."[8] *Id.* at 52.

Father explained the reason for his infrequent visits this year in his cross-examination by Maternal Grandparents' counsel.

> Q. [Y]ou heard testimony from [Maternal Grandparents] that basically you've seen the kids, we'll say, a handful of times in the past year or two.
>
> A. I heard them say that, yeah.
>
> Q. Was that inaccurate?
>
> A. Handful is like five. I seen [sic] them more than five times. But also I was going three of these classes a week, plus one-on-one a week, plus I had a parole officer in Montgomery County that I had to go to twice a week, plus I had a parole officer in Berks County I had to go to twice a week.[9] My days were, kind of, heavy.

_____

[8] Maternal Grandmother testified that the Pottstown Parade occurs on the July 4th holiday. N.T., 12/10/15, at 52-53.

[9] On inquiry by the orphans' court, Father testified that he had been released from prison in February of 2010, and he "was on the run" until being re-incarcerated in January of 2013. N.T., 12/15/15, at 70, 72. Father testified that he remained in prison until March 4, 2014, and that he served this time between the Berks County and Montgomery County prisons. N.T., 12/15/15, at 67, 70. He testified that he presently has one year remaining on a probation sentence in Montgomery County for a crime involving the possession of drugs. *Id.* at 68.

And, again, when I go over there, I don't like to have somebody over me as well. . . . Like, I understand if they're there, they have to listen to them, and we have to go by things they said, but there should be a little space for us. That's what I believe.

. . .

Q. For you it was more difficult to see the kids under [Maternal Grandparents'] supervision, and you would have preferred that they just let you have the kids?

A. Yeah. I would prefer they let me have my kids, yeah.

. . .

Q. So you described all the various appointments that you would have during the week. Did those include on the weekends?

A. No.

Q. You were eight blocks away.[10] Did you ever in the evenings just walk over to the house to see the kids?

A. Yes. Like, I walk by still all the time. If they're not outside and stuff -- when they're outside, I talk to them all the time. I just don't go in and deal with them.

N.T., 12/15/15, at 28-30.

Father testified on cross-examination by the Guardian *ad litem* that he never tried to work out a visitation schedule with Maternal Grandparents. N.T., 12/15/15, at 51. Further, Father acknowledged that Maternal

---

[10] Upon his release from prison in March of 2014, Father lived eight blocks away from Maternal Grandparents. N.T., 12/15/15, 30, 53-54. In September of 2015, Father moved to his current apartment. *Id.* at 60. Mother lives with Father and testified that their apartment is "[a] block or two" away from Maternal Grandparents' home. N.T., 12/10/15, at 236-237.

Grandparents never told him not to contact them. *Id.* at 52-53. With respect to whether he ever telephoned the Children, Father testified:

> Q. Did you ever call the children and speak with them on the phone?
>
> A. Not lately.
>
> Q. How often would you say that you have called them and spoken with them on the phone?
>
> A. Pretty much when I would be with [Mother] if we were cool, and she would call because, again, I don't really get along with [Maternal Grandparents].

*Id.* at 56. Father testified that he last saw the Children on November 26, 2015, when he sent a text message to Maternal Grandmother and requested that the Children visit him at his home. *Id.* at 57-58.

Based on the foregoing testimonial evidence, we discern no abuse of discretion by the orphans' court in finding that Maternal Grandparents did not place obstacles in the path of Father's performance of his parental duties. The testimonial evidence supports the court's finding that Father chose not to exercise his parental duties soon after CCCYS became involved with this family in December of 2010, through Maternal Grandmother's physical and legal custody award in May of 2012, and continuing to the time of the filing of the termination petitions. During all this time, Father displayed a "merely passive interest in the development" of the Children. *See In re B.,N.M.*, *supra*. Therefore, we reject Father's issue with respect to Section 2511(a)(1).

We next consider whether the orphans' court abused its discretion in terminating Father's and Mother's parental rights pursuant to Section 2511(b). Father argues the testimonial evidence does not support termination because it demonstrates that a bond exists between him and the Children. Mother argues the evidence was insufficient to support termination because Maternal Grandparents did not present evidence regarding whether a bond exists between her and the Children.

We have emphasized, in part:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)). In addition, in considering the affection a child may have for his or her natural parents, this Court has explained as follows:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent]

- 18 -

and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

The testimony of Maternal Grandmother demonstrates that terminating Father's and Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of the Children. Maternal Grandmother testified that the Children see her "[a]s their mom[,]" and Maternal Grandfather"[a]s their dad." N.T., 12/10/15, at 124. She testified that the oldest child, K.H.S., then age seven, is doing well both at home and in school. *Id.* at 59. She testified that A.J.M., nearly age five, who needed many health services after birth, no longer needs the services and is doing well. *Id.* at 64-68. She testified that Early Intervention Services monitored the youngest child, A.J.A.M.1, then age four, for the first year of her life, but that she never needed any services and is likewise doing well. *Id.* at 68.

However, the second oldest child, A.J.A.M.2, then age five and in kindergarten, has learning disabilities and anger issues, and he is diagnosed with Posttraumatic Stress Disorder. N.T., 12/10/15, at 61. Maternal Grandmother testified that he has an Individualized Education Program

involving speech and language. *Id.* She explained further that he receives wraparound services at school, and that he is under treatment with a psychologist. *Id.* Importantly, she testified that neither Mother nor Father has asked about A.J.A.M.2's services or whether they can participate in his services. *Id.* at 115. In addition, Maternal Grandmother testified that A.J.A.M.2 has made significant improvement since the beginning of the school year. *Id.* at 63-64.

With respect to the Children's bond with Father, Maternal Grandmother testified that that they do not view him as a father figure, but more as a playmate. N.T., 12/10/15, at 119-120. She testified that his daughters, A.J.M. and A.J.A.M.1, call him by his first name. *Id.* at 112. She testified that his son, A.J.A.M.2, has a stronger bond with Father than do his daughters. *Id.*

With respect to the Children's bond with Mother, Maternal Grandmother testified that the oldest child, K.H.S, loves her, and that he demonstrates this by sitting with her when she visits and being sad and withdrawn when she leaves. *Id.* at 69, 118. She testified that A.J.A.M.2 has resentment towards Mother, and that he demonstrates this by kicking, hitting, and fighting with Mother while she visits. *Id.* Significantly, Maternal Grandmother testified that she observed Mother discipline her sons, K.H.S. and A.J.A.M.2, by punching them in the chest on ten separate occasions. *Id.* at 131, 136. With respect to Mother's daughters, A.J.M. and A.J.A.M.1,

Maternal Grandmother testified that they "don't even know" Mother, and that they call Mother by her first name. N.T., 12/10/15, at 69, 99.

Finally, Mother testified that she has been in and out of prison since 2012 for crimes related to drugs. N.T., 12/10/15, at 260, 282. She testified that she was most recently incarcerated on December 18, 2014, and that she was released on April 10, 2015. *Id.* at 214-215. Mother testified that, in May of 2015, she began living in a halfway house, and, on September 9, 2015, she left the halfway house without permission. *Id.* at 222, 229-230. She testified that she turned herself in on November 8, 2015, and, as a result, she was re-incarcerated. *Id.* at 231. Mother remained incarcerated at the time of the subject proceedings, and she was awaiting her sentencing hearing. *Id.* at 243.

Based on the foregoing testimonial evidence, we reject Father's and Mother's arguments with respect to Section 2511(b). Indeed, the testimonial evidence demonstrates that the Children do not have a parent-child bond with Father. Likewise, the evidence demonstrates that the youngest three children do not have a parent-child bond with Mother. To the extent that the evidence reveals that K.H.S. may have a parent-child bond with Mother, the evidence overwhelmingly demonstrates that it is not a beneficial bond. We conclude that the orphans' court did not abuse its discretion in determining that involuntarily terminating Father's and Mother's parental rights will serve the physical, emotional, and developmental needs

and welfare of the Children.  Accordingly, we affirm the decrees pursuant to

23 Pa.C.S.A. § 2511(a)(1) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/29/2016